UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Dimov Associates LLC d/b/a Dimov Tax Specialists and Dimov Wasserman LLC </br>Plaintiffs </br>v. </br>Marc Wasserman, David Kane and Select Financial Solutions </br>Defendants. | Civil Action No. _____ |

### AFFIDAVIT OF GEORGE DIMOV
### IN SUPPORT OF PLAINTIFF'S ORDER TO SHOW CAUSE

I, GEORGE DIMOV, affirm the following under penalty of perjury:

1. I am a Certified Public Accountant.

2. I am the founder and owner of Dimov Associates LLC d/b/a Dimov Tax and CPA Services, a company incorporated in Miami, Florida, in September 2020, with the principal address at 401 NW 31st Avenue, Miami, Florida 33125.

3. I have businesses that provide tax and accounting services to clients in several states across the United States.

4. I first spoke with David Kane around August or September of 2024.

5. He is a licensed attorney who reached out to me about the possibility of acquiring Marc Wasserman PC CPA, which was owned by Marc Wasserman CPA.

6. We discussed the sale until eventually a contract for the purchase of Mr. Wasserman's business (the "Purchase Agreement") was drafted with the help of David Kane.

7. Mr. Kane and I discussed this over the phone and text. A true and correct copy of some of the text messages sent by Mr. Kane are attached as **Exhibit 1**.

8. The Purchase Agreement was signed by Mr. Wasserman on October 28, 2024. A true and correct copy of the terms of the Purchase Agreement are attached as **Exhibit 2**.

9. To operate the new business acquired from Mr. Wasserman, I incorporated a new entity in New Jersey on October 28, 2024, called Dimov Wasserman LLC.

10. All the shares of Dimov Wasserman are owned by me.

11. I initially decided that Mr. Wasserman should stay on to assist Dimov Wasserman as a consultant. This is because when a business is purchased, to ensure a smooth transition, the principal of the target company remains employed at the company after the acquisition for a few years.

Therefore, Mr. Wasserman signed a consulting agreement in October 2024 (the "Consulting Agreement") with Dimov Tax and CPA Services. A true and correct copy of the Consulting Contract is attached as **Exhibit 3**.

12. Further to this Consulting Agreement, Mr. Wasserman's place of work is the Dimov Wasserman office in New Jersey.

13. The same month the agreement was signed, October 2024, Mr. Wasserman began working onsite at Dimov Wasserman, alongside other employees of that entity, Jacqueline Heston and April Moore.

14. Both Ms. Heston and Ms. Moore had been employees of Mr. Wasserman at Marc Wasserman PC CPA.

15. Sometime after Mr. Wasserman began work, I noticed he was diverting client funds into his personal account.

16. As a result of this behavior, a cease-and-desist letter was sent by Dimov Tax and CPA Services to Mr. Wasserman in January 2025. A true and correct copy of this January 2025 cease-and-desist is attached as **Exhibit 4**.

17. During the course of his employment, on April 27, 2025, I discovered that Mr. Kane and Mr. Wasserman were involved in theft of my clients at Dimov Wasserman. This information was obtained when I spoke with Jacqueline Heston and April Moore on the phone, by email and also through the WhatsApp messaging application.

18. I do not personally know Derrick Wilson or Selective Financial Solutions. However, I was informed by April, one of my team members, that

Derrick Wilson is a close associate of David Kane and has been known to the company for years.

19. David Kane portrayed Mr. Wasserman's business in a positive light.

20. Mr. Kane stated the Mr. Wasserman's company had existed since 1992 and maintained a loyal client base.

21. Mr. Kane also attributed Wasserman's decision to sell to health issues—both his own and his spouse's—and framed the sale as part of a gradual retirement plan. Crucially, no negative financial or operational details were disclosed.

22. My interaction with Mr. Wasserman before the transaction was very limited. Mr. Kane seemed to control the lines of communication. Therefore, I only spoke with Mr. Wasserman twice before the acquisition and during the meeting Mr. Kane did most of the talking.

23. Prior to me acquiring Marc Wasserman PC CPA, no one disclosed that Mr. Wasserman had a suspended Electronic Filing Identification Number ("EFIN").

24. An EFIN is required for a tax professional to file tax returns on behalf of clients with the Internal Revenue Service (the "IRS") if you are filing more than 10 returns per year, as outlined in IRS guidance (IRS Tax Topic 801). Mr. Wasserman has submitted more than 10 returns within the current

tax year, so is in violation of this rule, which presents a regulatory risk to my business.

25.  As a licensed CPA firm, associating with someone with a suspended EFIN presents a serious regulatory risk. Had I known this, I would not have moved forward with the transaction or offered Mr. Wasserman a consulting agreement.

26.  I later learned during the week beginning May 12, 2025, from conversations with employees at Dimov Wasserman, that Mr. Kane was aware of the suspended EFIN months before I acquired Marc Wasserman PC CPA and was actually involved in trying to help Wasserman rectify it.

27.  I believe Mr. Kane and Mr. Wasserman devised the business sale as a workaround for Mr. Wasserman to continue practicing under someone else's EFIN.

28.  I would not have signed the Consulting Agreement if I had known about Mr. Wasserman's suspended EFIN.

29.  In addition, I would also not have agreed to the terms of the Purchase Agreement with knowledge of the EFIN suspension.

30.  In addition, after the acquisition, I discovered several issues.

31.  Mr. Wasserman owed over $300,000 in IRS tax debt, which was not disclosed. I found out about the value of this debt on or about January 15, 2025, in a phone conversation with Mr. Wasserman.

32. Mr. Wasserman borrowed over $33,800 from clients personally. I understand the method by which he offered to repay this was by providing work to the clients for which he would not charge. This is unethical and impermissible conduct.

33. Mr. Wasserman owed clients at least $18,100 in penalties and interest due to prior misconduct. He is doing free work for the clients to pay off this debt - work that should be billed and given to Dimov Wasserman, but he has failed to do so.

34. Although he has done little to no work for Dimov Wasserman since signing the Consulting Agreement, Mr. Wasserman submitted monthly invoices, which are therefore fraudulent. These invoices were paid by Dimov Wasserman.

35. All in all, Mr. Wasserman diverted, mismanaged, or immediately lost due to negligence and behavior 12.5% of the client base of Dimov Wasserman.

36. That is approximately $75,000 in immediate revenue, which has a lifetime value of over $750,000.

37. Mr. Wasserman used his personal cell phone to manage client relationships and diverted client payments via Zelle to his personal account, took money in cash from clients, did discounted or free work under his name or with the help of Mr. Kane and Derrick Wilson. This is not allowed under our

firm policy and contrary to the purpose of the acquisition of Mr. Wasserman PC CPA.

38. Despite repeated requests from January 2025 through March 2025, Mr. Wasserman also failed to transfer bank account ownership of Marc Wasserman PC CPA to Dimov Wasserman despite agreeing in conversation with me that he would add Dimov Wasserman's name to the account, or, alternatively, transfer the account to Dimov Wasserman.

39. I spent over $25,000 on marketing campaigns using Google, Facebook and physical mail to promote Dimov Wasserman.

40. Many leads generated from these efforts were hijacked by Mr. Wasserman, who took the revenue for himself.

41. On February 12, 2025, Mr. Wasserman falsely claimed to operate a financial planning firm to justify his separate client payments. In reality, he was providing tax preparation services independently and misappropriating client engagements.

42. I began receiving complaints from employees at Dimov Wasserman about Mr. Wasserman's conduct in November of 2024.

43. By December 1, 2024, however, I received direct evidence of client diversion.

44. Mr. Wasserman engaged in unprofessional behavior, including an incident on March 3, 2025, in which he threw a glass candy bowl at the office, shattering glass and frightening staff.

45. I later learned that Mr. Wasserman had missed payment of payroll for Marc Wasserman PC CPA in the months preceding the sale. This was not disclosed during the transaction, only immediately afterward.

46. Later, Mr. Wasserman asked me to raise staff wages.

47. Mr. Wasserman repeatedly failed to perform his responsibilities, despite being paid. He lacked access to tax software provided by Dimov Wasserman until late February 2025. Instead, he spent much of October 2024 through February 2025 without contributing to the staff assignments. Meanwhile, I was paying the team hourly to carry Mr. Wasserman's weight at Dimov Wasserman.

48. Moreover, Mr. Wasserman created delays, ignored emails, and submitted evasive responses—e.g., blaming his wife's schedule for missed work. This behavior disrupted my other businesses.

49. Dimov Wasserman uses strong data protection measures, including two-factor authentication, computer and software-level passwords, secured servers, and restricted internal access. Only authorized employees may access client data.

50. Violating our internal office policy, Mr. Wasserman installed ProSeries, that is a different software from ProConnect, while onsite at Dimov Wasserman. He was subverting the system by using his two personal email addresses.

51. Due to Mr. Wasserman's misconduct and misrepresentations, I now estimate the long-term value loss as follows: immediate marketing loss of $25,000; $25,000 operational losses on my end integrating his firm's operations into mine; $75,000 worth of client revenue which he diverted away from Dimov Wasserman; and lost long-term recurring client value (estimated at a value of over 10 years) of at least $750,000.

52. Due to Mr. Wasserman's misconduct and misrepresentations, I now estimate the long-term value loss as follows: immediate marketing loss of $25,000; $25,000 operational losses on my end integrating his firm's operations into mine; $75,000 worth of client revenue which he diverted away from Dimov Wasserman; lost long-term recurring client value of at least $750,000; reputational damage of $300,000; staff disruption costs of $75,000, IT, compliance remediation costs of up to $30,000, damages for fraudulent inducement of $300,000. This also does not include legal fees, which are still accruing as well. Over all, the damages would be $1,580,000 and counting.

53. I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

_G Dimov_  May 23, 2025
George Dimov

9