## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Dimov Associates LLC d/b/a Dimov Tax Specialists and Dimov Wasserman LLC | ) Civil Action No. _____ ) ) |
| Plaintiffs | ) |
| v. | ) |
| Marc Wasserman, David Kane and Select Financial Solutions | ) ) |
| Defendants. | ) ) |

### DECLARATION OF APRIL MOORE
### IN SUPPORT OF PLAINTIFFS' ORDER TO SHOW CAUSE

I, APRIL MOORE, affirm the following under penalty of perjury:

1. I am an enrolled agent, senior accountant at Dimov Wasserman LLC ("Dimov Wasserman").

2. I began working there on October 27, 2024.

3. In my current role at Dimov Wasserman, my tasks include but are not limited to: tax preparation, client meetings and communication, managing accounting staff and work flow, client representation and tax resolution with the IRS and state agencies, reviewing financial statements and accounting records processing, as well as miscellaneous tax filings per client needs.

4. I began employment at Marc Wasserman PC CPA in December 2003.

1

5. I did not know Marc Wasserman prior to working for him but was referred to him for a job interview by a client of Mr. Wasserman's, also a friend of mine, who knew Mr. Wasserman was looking for additional accounting help.

6. At the time I first made contact with Mr. Wasserman, I was just a college student looking for accounting experience, so I was eager to get started in the field while I finished my accounting degree.

7. I worked for Marc Wasserman, PC CPA until its eventual sale to George Dimov in October 2024.

8. George Dimov opened up a company, Dimov Wasserman, which is incorporated and has an office in New Jersey.

9. Mr. Wasserman also came to work for Dimov Wasserman after the sale of his business.

10. As a result, we are still working together in the same office.

11. I briefly met Derrick Wilson on at least two occasions that I can recall.

12. Mr. Wilson was in our office, scheduled for meetings with Mr. Wasserman and existing firm clients.

13. Mr. Wilson provided financial advice, and he also attempted to sell financial services with Mr. Wasserman to existing Marc Wasserman PC CPA clients.

14. Additionally, in 2025 I also was made aware of copies of 2024 tax returns found in the office that had been prepared for our existing clients, showing

Mr. Wasserman as the preparer and "Selective Financial Solutions" as the tax preparer firm.

15. When I received those tax returns from the staff member who found them, a quick Google search showed Derrick Wilson was the owner of Selective Financial Solutions.

16. I am aware that both Mr. Wilson and Mr. Wasserman had client meetings in our office. I was also sent at least one email from a client which read, "Derrick Wilson opened an IRA in my name…"

17. All of these in person interactions were in 2023.

18. I know David Kane because he is an attorney that I have had professional interaction with for many years as an employee of Marc Wasserman PC CPA.

19. Most recently I overheard conversations between Mr. Wasserman and David Kane, where they were discussing client services and Mr. Wasserman not being able to reach Mr. Wilson.

20. Mr. Wasserman has also made a point to tell staff recently that he has a right to do work with David Kane and Derrick Wilson, claiming those financial services are outside the scope of his contract with George Dimov.

21. I have personally met and seen Mr. Kane in Dimov Wasserman's Hainesport office, and also reviewed his tax returns with him the year Mr. Wasserman was out of work due to disability.

22. I also received calls from Mr. Kane to our office.

23. In addition, I have been on conference calls and email threads with Mr. Kane regarding Mr. Wasserman's financial situation, the sale of his business and issues regarding Mr. Wasserman's client service revenue diversion.

24. I have seen emails where Mr. Wasserman sent to me and Mr. Kane schedules of his existing debt and possible debt solutions.

25. I was in our office in January 2025 and on a call with Mr. Wasserman and Mr. Kane, where Mr. Wasserman discussed the funds he had diverted away from Dimov between November and January, which included Mr. Wasserman discussing how I helped him comb through financial records to provide information to Dimov's team to document funds diverted.

26. On that call, Mr. Kane verified that one particular deposit on Mr. Wasserman's bank account statement was not diverted revenue but a loan Mr. Kane had made to Mr. Wasserman to help him with personal cash flow issues.

27. Mr. Kane apparently knew about the diverted revenue prior to this call because no explanation was provided at all; he obviously already knew about the situation before this call.

28. I am also aware of calls from David Kane and Mr. Wasserman's conversations on his cell while in office during normal business hours regarding services being provided by both of them together and the fact he was angry that he recently took continuing professional education ("CPE") and wants to sell securities and insurance.

29. This was shown in an e-mail sent by Mr. Wasserman in which I was included.

30. Mr. Wasserman insisted that he would be entitled to any commissions for our clients from any kind of securities or insurance sales, since "he is licensed."

31. An Electronic Filing Identification Number ("EFIN") is an identification number needed to file tax returns with the federal government.

32. Mr. Wasserman's EFIN was suspended in or about June 2024 due to unresolved IRS tax liabilities he owed.

33. I found out about this when the tax software we used to file was rejecting all returns submitted. We were utilizing UltraTax software for the tax filings.

34. I think there was originally 30 days' notice given by the IRS that a suspension was impending, but then, suddenly, Mr. Wasserman was suspended immediately the next day after this notice because his infraction, failure to pay tax, was so severe.

35. Mr. Wasserman appealed his suspension. He received a letter from the IRS on June 5, 2024, that confirmed they were in receipt of this appeal. A true and correct copy of this IRS letter on June 5, 2024, is attached as **Exhibit 1**.

36. I do not know the exact amount of tax liability he owed to the IRS but it was greater than $175,000.

37. I was not part of any discussions between Mr. Wasserman and Mr. Dimov prior to the sale so I am not aware if Mr. Wasserman disclosed the EFIN issues to Mr. Dimov.

38. In the months prior to the sale of Marc Wasserman PC CPA, I was in the office and overhead a conversation between Mr. Wasserman discussing his EFIN suspension on the phone with David Kane and how it would directly affect his practice's continued operations.

39. I am also not aware of any discussions between Mr. Wasserman and Mr. Dimov prior to, or after, the sale where the EFIN was discussed.

40. As a result of the EFIN suspension, all client returns after that date had to be paper filed, which led to significant delays and frustration.

41. IRS paper processing typically takes 6–8 weeks, and New Jersey may take up to 3 months.

42. Ron Warren is a licensed attorney who worked with Mr. Wasserman on the appeal to the IRS against the suspension of Mr. Wasserman's EFIN as well as helping him get certain required documents (a 941 tax form) and minimum payments paid to try to expedite a good standing with IRS.

43. Mr. Wasserman, on July 18, 2024, received notice that the IRS would let their original decision to suspend him remain in place. A true and correct copy of this IRS letter on July 18, 2024, is attached as **Exhibit 2**.

44. Mr. Wasserman submitted tax returns for clients in 2024 and some returns were rejected for issues like missing forms (e.g., 1095-A) or dependent claim discrepancies.

45. These rejections were not discovered until months later, sometimes leading to penalties and interest for the additional or unpaid tax liabilities.

46. In some cases, such as our clients who had S-Corps or 990 forms submitted, there were paper filing penalties as well.

47. Many of the client tax returns that Mr. Wasserman should have mailed were not, instead he claimed he was personally taking them to the IRS office.

48. Mr. Wasserman would make multiple copies and then forget to take tax returns or simply file the wrong one.

49. At Dimov Wasserman, we recently received notices in April and May 2025 from clients where the IRS is claiming their 2023 return was never filed.

50. Mr. Wasserman also set up a different company called MW Tax and Accounting LLC and filed for an EFIN using someone else's name, Crystal Carr, but Mr. Wasserman's attempt did not work. A true and correct copy of the EFIN letter to Crystal Carr on July 25, 2024, is attached as **Exhibit 3**.

51. The EFIN was assigned but verification of the EFIN by the software with the IRS was not approved. Therefore, he was not able to add this new EFIN to the tax preparation software to file client returns.

52. I do not know if Crystal Carr is even a real person or some alias Mr. Wasserman used.

53. I raised concerns about this multiple times, as my understanding is that working with or hiring someone whose EFIN is suspended could pose compliance risks for the buyer or hiring firm.

54. After the sale of Mr. Wasserman's business, in November 2024, we had some delays with getting payment processing switched over from Marc Wasserman PC CPA to Dimov Wasserman quickly.

55. This meant we had access to Mr. Wasserman's bank account records to try to expedite the process.

56. While some client payments were deposited to a Marc Wasserman PC CPA bank account to capture the initial client ACH payments, these funds were intended to then be forwarded by wire to Dimov Wasserman.

57. However, while reviewing and reconciling those records, it was discovered that Mr. Wasserman was depositing checks and cash from Dimov Wasserman clients into his bank account.

58. Mr. Wasserman continues to exhibit the same misleading behavior. I witnessed him ask clients for Zelle payments and overheard him meeting behind closed doors or outside the office with Dimov Wasserman clients where he would ask them to send him money personally, which was against office policy and may divert the revenue from Dimov Wasserman.

59. During the months that followed, I found documents reflecting work done for existing Dimov Wasserman clients that were not billed through Dimov, along with Mr. Wasserman's personal deposit slips and bank statements showing client payments to him.

60. Most recently, we discovered tax returns for existing Dimov Wasserman clients prepared for the 2024 tax year with Mr. Wasserman's name as the preparer, but Dimov Wasserman was not listed as the preparer firm, which it should have been.

61. In addition, I had some interactions with clients when we were discussing invoicing. Some would say they "paid by Zelle" or already paid. This came as a surprise to me.

62. When I researched those claims, I found they paid Mr. Wasserman through means that were not permitted by our Dimov Wasserman company policy.

63. These events continue to occur even after we reported this to George Dimov and a cease-and-desist order was issued in January 2025. A true and correct copy of this cease-and-desist letter is attached as **Exhibit 4**.

64. Mr. Wasserman has also displayed aggressive behavior in the workplace.

65. Mr. Wasserman, Jacqueline Heston, and I were present and working in the Dimov Wasserman office on March 3, 2025.

66. A client came in to discuss an IRS assessment he received and had provided to Mr. Wasserman during an earlier appointment on February 27, 2025.

67. As happens frequently, Mr. Wasserman misplaced the paperwork and had not done anything to begin a path forward to resolve the IRS matter for the client.

68. The client expected Mr. Wasserman to get on a call with him and the IRS but since Mr. Wasserman couldn't find the paperwork, that didn't happen.

69. As the client sat calmly in the conference room, Mr. Wasserman got increasingly agitated and angry and started screaming about how "I can't do all of this myself. No one will help me."

70. There was a glass candy dish on the file cabinet outside the conference room door. Mr. Wasserman picked it up and threw it at the floor. The glass broke all over the middle of the office floor. A true and correct copy of this glass broken on the office floor is attached as **Exhibit 5**.

71. I immediately instructed him to leave the office and not return to the office until he was under control.

72. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on May 22, 2025            ___April Moore___

                                     April Moore